## EVANS *vs.* SMITH.

Two sisters, Jincey and Patsey, executed an instrument, which was, in in substance, as follows :

" Know all men, that we, Jincey and Patsey, do ' covenant and agree,' that, for the love we bear to each other, whichever of us may be the longest lived, shall be the heir of the other."

*Held*, That the instrument was a will.

Caveat to Will, from Fayette superior court. Tried before Judge BULL, at September Term, 1858.

Martha T. Smith, propounded for record and probate in the court of Ordinary of Fayette county, the following paper as the last will and testament of Jincey E. Smith, deceased, to-wit :

Georgia, } Know all persons by these presents, that we, Jane E. Smith of the Baldwin County, one part, and Patsey T. Smith of the other part, both of the State and county aforesaid, have this day covenanted and agreed, and by these presents do each of us covenant and agree with each other, that for and in consideration of the love and affection we have for each other, that we agree and covenant and bind ourselves to each other, that whichever of us it may please the hand of Providence to

remove first by death, the other shall be sole heir to all the estate which the deceased shall or may own, at the time of her death, both real, personal and perishable— that is to say, that should the said Jane E. Smith die and leave the said Patsey T. Smith living, the said Patsey is to be sole heir to all the estate the said Jane E. may or shall own at the time of her death; or that should the said Patsey T. die first and leave the said Jane E. living, then the said Jane E. is to be sole heir to all the estate the said Patsey T. may or shall own at the time of her death; and we further covenant and agree that it shall be the privilege of the one that may or shall be the longest lived, to make whatever disposal of all the property, both real, personal and perishable, that may, in her judgment, be most suitable.

Given under our hands, this the 25th of March, 1856, and in witness whereof we have this day written our names and seals in presence of

                                    JINCEY E. SMITH. [L. S.]
R. L. G. Bozeman, ⎫      PATSEY T. SMITH. [L. S.]
T. C. Mathews,    ⎬
Jos. B. Williams. ⎭

B. T. Evans filed his caveat to the probate of said paper as the will of Jane E. Smith, upon the following grounds:

1st. Because said written instrument is not a testamentary disposition of property, nor was it the intention of the said Jincey E. Smith, that it should operate as her last will and testament.

2nd. Because said writing was not executed by said Jincey, and if so, was not executed by her freely and voluntarily, but under persuasion, force and undue influence.

3rd. Because, at the time said instrument of writing purports to bear date, said Jincey was not of sound and disposing mind and memory.

4th. That such instruments are contrary to public policy, and therefore void.

5th. Because the paper propounded is not a will, but a covenant or agreement, which it required the assent of both parties to change or alter or revoke.

Upon the trial, on appeal, in the superior court, the propounder introduced the following testimony:

*Richardson L. G. Bozeman*, testified that he knew Jane (or Jincey) E. Smith and Martha (or Patsey) T. Smith, well —they were his aunts—he lived with them from the time he was about one year old until he was twenty-three or four years old—Jane was called in the family Jincey. At the date of the will, and for several years before, witness lived in Alabama. He came over to Fayette to attend to a case in court for his aunts—the case was set down for the first week, and after he got here, it was postponed until Wednesday of the second week. Witness had not seen his aunts for four or five years, and as he had to remain so long, he went out to see them. Jane was in Fayette county, but Patsey was down in Baldwin. Witness concluded to go to see his aunt Patsey, and Jincey said she wanted to go to Baldwin and would go with him —they went together. Sometime after they got there, Jane said one reason she had for coming to Baldwin was to get Iverson L. Harris to write her will. Witness told her she would have to put it off then, for Harris was at Putnam court. Jincey then asked witness to write her will—witness told her he had never done such a thing in his life, and did not know how—that he had written a deed and could do that, but did not know how to write a will. Jincey said she reckoned he could write down what a body wanted, and insisted on his doing it. She then got a half sheet of paper, ink and pen, and brought them and put them on a table, and told witness to write her will. She wished to give her property all to Patsey. Witness commenced writing and wrote "Georgia, Baldwin county;" Patsey then said, "when you get done that, I want you to write my will too." Witness told her she

Evans vs. Smith.

would have to get some more paper then. She replied, after examination, that that was all there was in the house. Witness then asked her how she would make her will; she said, "as I have always told you, I am going to give my property to Jincey." Witness then said, "well, if you are going to will your property to Jincey, and Jincey is going to give hers to you, I dont see why you both can't make your wills on the same piece of paper." Both said they saw no objection to it either. Witness then wrote the instrument propounded, and read it to them, and asked "if it was right?" they said, "yes, they reckoned so." Both of them then signed the will in the presence of the witness, who attested it in their presence. Witness expressed a doubt whether one witness was enough—Jincey said she thought one witness was enough —that she had known of several wills set up by one witness, and that old Mr. Peeple's will, which had been carried out by General Myrick in Baldwyn, was set up and had no witness. A day or two after, witness and Jincey left Baldwin, to return to Fayette in time for the case, and as they were riding along, witness picked up a paper in the cars and read a piece which said there was a law which every farmer ought to know, and which few did know, and that was that a will was not good unless it had three witnesses; he read it to his aunt Jane and she made no reply. A day or two after their arrival in Fayette, Jincey, who had taken charge of the will and brought it from Baldwin, told witness to take the paper and carry it to Mr. Stone, and ask him if it would do, and if it would not do, she wanted him to write her one. Witness brought it to Mr. Stone, who said it was not good as it stood, but if Jincey would acknowledge it as her will in the presence of two more witnesses, it would then be a good will as to her. Col. Doyal also said it would then be a good will as to her, but she had better give a lawyer ten dollars to draw one. Witness communicated their

opinions to his aunt Jincey—she said she had no ten dollars to throw away, and if that paper would do with more witnesses, she would have them.  A few days after, when witness was about to return to Alabama, Jincey told him not to leave yet, that she had sent for Mr. Williams and Mr. Mathews to come and witness her will, and they would be there directly.  Witness waited, and in a little while Mathews and Williams came.  Jincey brought out the paper and showed it to them, and it was read to her again.  She then said, putting her finger on the name, " I scratched or writ that there for my name, and I saw Rich, (witness,) sign it as a witness—this is my will—I want to give my property to Patsey, and want Mathews and Williams to sign it as witnesses."  Mathews and Williams then attested it in the presence of Jincey and all in the presence of each other.  Jincey asked if they had not better send for a justice of the peace to witness it also.  Mathews said it was not necessary.  She said she wanted Patsey to have her property and no body else, and she wanted to make the will good if it took twenty witnesses ; after it was executed she gave it to witness and told him to keep it, and after her death he would have to see it carried out.  As witness was about to leave, he asked his aunt what should be done about Patsey's signing the will.  She said, " well, when you go to see Patsey again, you can take it with you, and if she is a mind to acknowledge it before witnesses and make it good as to her, she can do so, and if not she can let it alone, it made no difference, and Patsey might give her property to witness or any body else she pleased."  She was all this time of sound and disposing mind and memory, and acted freely and voluntarily, as far as witness knows—he never heard any body in his life persuade her to make a will— has heard her say often, he supposes five hundred times, that she intended to give Patsey her property at her death—never spoke of giving it to any other person.

Patsey and Jincey were twin maiden sisters, and generally lived together, and always kept more or less of their property together. Jincey had two other sisters, the mother of witness, and Nelly G. Evans, who was in the house when the will was acknowledged before Mathews and Williams—she had married Boswell Y. Evans, the caveator, but she was at that time, and had been for years before, living separate from him, and Jincey said she never wanted Evans to get a cent of her property. Jincey was always a woman of great firmness and decision, and ruled everything about her place.

*Joseph B. Williams* testified, that he had known Jincey E. Smith from 1850 till her death—lived in a quarter of a mile of her—identified the paper propounded—attested it as a witness, in presence of Jincey and at her request, and saw Mathews do so also ; all in the presence of each other. He also proved her sanity, health and volition, and testified to the circumstances of the acknowledgement of the paper and her declarations at the time as ptovrd by witness Bozeman. She told witness a day or two before, that she wanted him to come over and witness her will, and on the day sent a boy for him—has often heard her say she was going to will her property to Patsey, and no body else—often heard her say afterwards that this was her will, and she had given her property to Patsey—never heard her speak of giving it to any other person, at any time, nor express a desire to do so. She was a woman of great firmness and decision, and had her own way.

*Col. Stone* testified that he had seen the paper propounded before—had a business transaction with Jincey E. Smith, and from that, judged her to be a woman of decided firmness—a woman of her own head, and who had her own way and will.

The witness, Bozeman, on his *voire dire*, stated that since the death of Jincey E. Smith, the propounder had made him an absolute deed, conveying to him all the

property owned by Jincey at the time of her death, which was on record, but that he had relinquished afterwards all his interest in the same to the propounder, which was also on record, and that he had then, no interest in the case.

Counsel for caveator objected to all the foregoing evidence, so far as it was intended to affect the language or terms of said instrument, or to give it the effect and operation of a will.

The paper propounded was then tendered in evidence, and counsel for caveator objected to its introduction—the objection was overruled by the court, and the paper read to the jury as the last will and testament of deceased, and counsel excepted.

The jury found for the propounder, and set up the paper as the last will and testament of Jincey E. Smith, deceased; whereupon counsel for caveator tendered his bill of exceptions, assigning as error the foregoing decisions of the court.

OVERBY & BLECKLEY, and TIDWELL & WOOTTEN, for plaintiff in error.

HUIE & CONNOR, and B. H. HILL, contra.

By the Court.—BENNING, J., delivering the opinion.

The exceptions are two—one to the admission of the verbal evidence as to intention; the other to the admission of the paper as a will.

The object of this verbal evidence was, to show that the paper was a will; and whether the evidence was admissible or not, depended on, whether showing that, would have been to contradict the paper. If showing that, would have been consistent with the terms of the paper, then, to show that would not have been a violation

Evans vs. Smith.

of any rule of which we are aware.    There is no rule that excludes parol evidence consistent with the writing to which it relates.

The question then is this: was the paper such, that, it might, on its face, be read as a will—as the will of Jincey Smith?   And we think it was.

The *words* will bear that construction.   If we take the mere words, we may say, that the instrument was a double will—the will of each sister.   The words will well bear the following meaning, viz: "I, Jincey, out of my love for Patsey, do agree to make her my heir if she outlives me; and I, Patsey, out of my love for my sister Jincey, do agree to make her my heir if she outlives me." The consideration of each sister is her love for the other —not this agreement of the other.   The making of the instrument by the one sister, is not the consideration for the making of it by the other.   No; the making of it by the one, is an act entirely independent of the making of it by the other.   The case is, in substance, precisely the same as it would have been, if each sister had executed a separate paper, and had said in that paper just what makes her part in the joint paper.   The mere *words*, I say, authorize this conclusion.   Suppose, then, that each sister had executed a separate instrument, and in it had expressed the same ideas which she expressed in the joint instrument, would these instruments not be wills?   What would there be to prevent them from being wills—assuming, of course, that they were properly attested, and were otherwise regular as to form?   Nothing, as far as we can see.   They would be instruments merely in consideration of love; therefore, they would be revocable at pleasure; they would be instruments not to take effect until the death of their respective makers; therefore, they would not be deeds, for deeds take effect at their execution. Then, they would be wills, or they would be nothing. It is true, that they would be in form, *covenants* to convey,

Evans vs. Smith.

and not actual conveyaces. But a will may take the form of most, if not of all other instruments. It may take the form of a covenant. In Coop vs. Coop, the instrument was in these words: "By this deed I bind myself to give to my wife, either upon the demise of her mother, or the sale of the Yorkshire estate," &c., &. "I do, therefore, hereby ordain that my executors, administrators and assigns, consider this deed as the most solemn obligation, in confirmation of which, I set my hand and seal." This instrument, though in form, only a bond, or covenant, was held to operate as a will. Note to Thorald vs. Thorald, 1 Eccl. Rep., 15. Indeed, mere precatory words often amount to a will.

Two cases were read to show that this was an instrument " unknown to the *testamentary* law." The first was the case of Hobson vs. Blackburn 2, Eccl. Rep., 116. But in that case, the *execution* of the paper by each one of the parties to it, was clearly the consideration for the execution of it by the other; and that distinguishes the case from this.

The other case was in the 2d of Dev. & Bat. 558, and it seems to be distinguishable in the same way from this.

If, then, we confine ourselves to the mere words of this instrument, we must conclude that it is a will.

It follows, therefore, that verbal evidence going to show that it was a will, was entirely consistent with it, and was, therefore, admissible.

And that evidence once in, the case became clear beyond a doubt, that the paper was a will. The evidence of Bozeman on the point, is so full, so minute, so simple, and every way so likely, that it is irresistible.

We think, then, that the court was right, both in admitting the verbal evidence, and in holding that the instrument was a will.

Judgment affirmed.